# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

JAMES T. MCALLISTER, JR.                          CIVIL ACTION

VERSUS                                            18-361-SDD-RLB

MCDERMOTT, INC., f/k/a
J. RAY MCDERMOTT & CO., INC.
ET AL.

## RULING

This matter is before the Court on the *Motions for Summary Judgment* filed by Defendants, Tate Andale, Inc. ("Tate Andale"),[1] Spirax-Sarco, Inc. ("Sarco"),[2] Velan Valve Corporation ("Velan"),[3] Air & Liquid Systems Corporation ("Air & Liquid"),[4] and Flowserve US, Inc. ("Flowserve").[5] Plaintiffs, Belinda D. McAllister, individually, as a surviving heir and as Independent Executrix of the Estate of James T. McAllister, Jr., and James T. McAllister III and Sean McAllister, as heirs of James T. McAllister ("Plaintiffs"), filed *Oppositions* to each of Defendants' motions.[6] Tate Andale, Velan, Air & Liquid, and Flowserve filed *Replies*.[7] For the following reasons, the Court grants summary judgment in favor of Tate Andale and Velan and denies summary judgment to all other moving Defendants.

---

[1] Rec. Doc. Nos. 228 & 233.
[2] Rec. Doc. No. 232.
[3] Rec. Doc. No. 239.
[4] Rec. Doc. No. 241.
[5] Rec. Doc. No. 242.
[6] Rec. Doc. Nos. 287, 283, 282, 285, & 284.
[7] Rec. Doc. Nos.  308, 307, 306, & 305.  In one instance, Plaintiffs filed a *Sur-Reply*, Rec. Doc. No. 323.

I.    BACKGROUND

James T. McAllister ("McAllister") filed this lawsuit after being diagnosed with asbestos-related malignant pleural mesothelioma on or about September 19, 2017.[8] Sadly, McAllister died from this disease on February 3, 2019.[9]  McAllister's wife and sons, listed above, have been substituted as Plaintiffs in this action.

McAllister began his service in the United States Navy in June of 1964.[10] In October 1966, he began service aboard a nuclear submarine, the *TRITON*,[11] where he served until late 1968 or early 1969, when he was transferred aboard another nuclear submarine, the *STURGEON*.[12] McAllister served on the *STURGEON* until October of 1969.[13]  After additional schooling, he transferred aboard the *CORRY*, a destroyer, where he stayed until his honorable discharge in 1972.[14]

Before his death, McAllister was deposed, and he testified about the work he performed aboard these naval vessels.  As a machinist mate aboard the *TRITON* and *STURGEON*, McAllister worked in the engine rooms maintaining various kinds of equipment.[15]  He worked with and around asbestos-containing gaskets, packing, and insulation while maintaining valves, pumps, and steam traps.[16]  Because preformed gaskets were not available, machinist mates were required to make custom asbestos

---

[8] Rec. Doc. No. 287-3, Deposition of James McAllister, Vol. I, at 17:03-10; 17:22-18:06; 18:21-19:11; 19:19-25.
[9] *See* Rec. Doc. No. 117, Suggestion of Death Upon the Record Under Fed. R. Civ. P. 25(a).
[10] Rec. Doc. No. 287-3 at 27:18-25.
[11] *Id.* at 27:18-29:08.
[12] *Id.* at 29:09-14.
[13] *Id.* at 29:15-17.
[14] *Id.* at 29:15-30:19.
[15] *Id.* at 25:24-26:03; 31:18-22; 31:23-32:14; 37:10-20.
[16] *Id.* at 30:20-31:17; 33:06-23; 61:06-62:15.

gaskets.[17]  McAllister was exposed to asbestos when fitting and trimming gasket material for installation on flanges – a process that created dust.[18]  McAllister testified that referred to the equipment manufacturer's Technical Manual to determine the type of gasket and packing material to use on pumps and valves.[19]

McAllister testified that he was also exposed to dust when he removed old asbestos gaskets from equipment using a scraper, putty knife, and wire brush or pneumatic wire brush.[20]  Gasket material deteriorated because of high temperature applications, and it would stick to flanges.[21]  Old gasket material had to be completely removed for a proper seal to be achieved.[22]  McAllister estimated that it took 10 to 30 minutes to clean a flange and remove old gasket material, depending on how badly the gasket was adhered and the diameter of the flange.[23]  McAllister testified that he replaced gaskets in this manner on valves, pumps, and steam traps "[h]undreds and hundreds" of times while in the Navy.[24]  Further, even when McAllister himself was not removing gaskets, others around him often were, exposing him to the same dust.[25]  McAllister was also required to clean up gasket debris with a broom, which created more dust.[26]

McAllister testified that he often observed the stenciled name of the manufacturer

---

[17] *Id.* at 52:05-53:18; 53:05-18.
[18] *Id.* at 56:01-57:10.
[19] *Id.* at 80:09-82:07, 83:07-85:03.
[20] *Id.* at 56:01-58:24.
[21] *Id.* at 64:15-65:01.
[22] *Id.* at 63:25-64:14.
[23] ***Id.*** at 65:02-16.
[24] *Id.* at 58:25-62:15; 76:17-24.
[25] *Id.* at 254:15-23.
[26] *Id.* at 85:09-20; 108:23-21; 111:13-20; 115:24-116:13.

of the gaskets he was removing if the condition of the material allowed.[27] The gaskets he cut and installed bore the name of the gasket stenciled across the length of the sheet.[28]  On the *TRITON* and *STURGEON*, McAllister specified that he installed and replaced Garlock, Cranite, and Durabla gaskets on various types of equipment.[29] McAllister testified that he removed and replaced these brands of gaskets hundreds of times while in the Navy.[30]

McAllister also worked with asbestos-containing packing that was used as a seal in various places on pumps and valves.[31]  He would cut the amount of packing that was required based on the pump or valve manufacturers' recommendation according to the tech manuals, which specified the amount of packing and what type to use.[32]  McAllister was exposed to asbestos when he removed packing that had deteriorated into chunks causing the lack of proper seal; he would then use an air hose to blow the packing gland and ensure it was clean.[33]  The process of pulling packing created dust, and the use of an air hose to blow out the packing gland created "dust all over the place."[34]  During his time aboard the *TRITON* and *STURGEON*, McAllister estimated he replaced packing "hundreds and hundreds of times."[35]

McAllister testified that, as to the pumps he maintained, he was able to identify the brand of pump by the nameplate, which indicated the manufacturer, model number,

---

[27] *Id.* at 79:21-80:08.
[28] *Id.* at 53:19-54:01.
[29] *Id.* at 96:12-20; 102:20-104:01; 105:07-20; 113:17-115:18.
[30] *Id.* at 104:02-06; 106:11-15; 108:11-21; 117:16-118:05.
[31] *Id.* at 85:21-87:14.
[32] *Id.* at 87:19-90:10; 88:18-89:02.
[33] *Id.* at 90:11-91:03.
[34] *Id.* at 94:10-95:05.
[35] *Id.* at 95:24-96:11.

serial number, and other information about the pump.[36]  Gaskets were used on the intake

of the pump, on the discharge side of the pump, and on top of the pump.[37]  The electric

motors had a transition piece that connected the motor to the pump casing, and there

was an additional asbestos gasket within the pump casing.[38]  McAllister testified that,

while removing gaskets from pumps, he would use a paint scraper and hand wire brush

using care not to scrape the surface.[39]

McAllister described the manner in which machinists worked in the engine rooms

aboard these vessels:  There were three shifts, and only six machinist mates would

actually be performing maintenance in the engine room on each shift.[40]  All machinist

mates in the engine room were performing the same type of equipment maintenance

amongst one another.[41] When working on larger equipment like pumps in the engine

rooms, McAllister explained that the repairs could span more than one shift, and more

than one machinist mate would help perform the work.[42]

McAllister originally filed suit in Louisiana state court, alleging that he contracted

malignant mesothelioma as a result of working with asbestos-containing products while

serving in the Navy.[43] Air & Liquid removed this matter to this Court.[44]  McAllister sued

numerous defendants, alleging that he was exposed to asbestos and asbestos-

containing products designed, manufactured, sold, supplied, used, owned or removed

---

[36] *Id.* at 36:20-37:06.
[37] *Id.* at 66:05-14.
[38] *Id.* at 66:05-67:01; Rec. Doc. No. 285-4, Deposition of James T. McAllister, Vol. II at 517:10-518:10.
[39] Rec. Doc. No. 285-3 at 337:25-339:11.
[40] *Id.* at 339:21-341:18; Rec. Doc. No. 285-4 at 496:16-497:23.
[41] *Id.* at 37:10-20; 340:21-341:03.
[42] *Id.* at 46:02-17.
[43] Rec. Doc. No. 4-2, ¶ 7.
[44] Rec. Doc. No. 1.

by the identified defendants.[45]  The Defendants named above have individually moved for summary judgment, but they all generally argue that Plaintiffs have failed to demonstrate genuinely disputed material facts regarding McAllister's exposure to their products sufficient to prove causation.[46]  The Court will address each motion, and the specific evidence relating to each motion, below.

## II.    LAW & ANALYSIS

### A.  Summary Judgment Standard

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines there is no genuine dispute of material fact.[47] "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."[48]  The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case.[49]

Once the party seeking summary judgment carries its burden pursuant to Rule 56, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial.[50] The showing of a genuine dispute is not satisfied by creating "some metaphysical doubt as to the material facts, by conclusory

---

[45] Rec. Doc. No. 4-2, ¶ 7.

[46] Some Defendants have asserted other grounds for summary judgment, and each Defendant's specific arguments will be addressed in turn.

[47] *See* Fed. R. Civ. P. 56.

[48] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[49] *Id.*; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

[50] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[51]  Rather, a genuine dispute of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."[52]  The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine dispute.[53]  The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor."[54]

### B.  Scope of Liability - Causation

The Parties do not dispute that general maritime law applies to this case.[55]  Each movant contends summary judgment is appropriate because Plaintiffs cannot prove causation.  Under general maritime law, to recover against any Defendant, Plaintiffs must prove that the injury was "legally caused" by that Defendant.[56]  A proximate, or legal, cause is "something more than 'but for' causation, and the negligence must be a 'substantial factor' in the injury."[57]  The Fifth Circuit has held that, "[w]hether the defendant's conduct was a substantial factor is a question for the jury, unless the court determines that reasonable men could not differ."[58]  Movants rely on the Sixth Circuit's strict standard set forth in *Lindstrom v. A-C Prod. Liab. Tr.,*[59] which held: "'[m]inimal exposure' to a defendant's product is insufficient [and] [l]ikewise, a mere showing that

---

[51] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted).

[52] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[53] *Id.*

[54] *Id.* at 255; *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

[55] Plaintiffs have noted, in certain limited instances and against certain defendants, that they submit that Louisiana state law applies, but not for the purposes of the motions at issue herein.

[56] *Donaghey v. Ocean Drilling & Expl. Co.*, 974 F.2d 646, 649 (5th Cir. 1992) (citations omitted).

[57] *Id.* (quoting *Thomas v. Express Boat Co.*, 759 F.2d 444, 448 (5th Cir. 1985)).

[58] *Borel v. Fibreboard Paper Prods Corp.*, 493 F.2d 1076, 1094 (5th Cir. 1974).

[59] 424 F.3d 488, 492 (6th Cir. 2005).

defendant's product was present somewhere at plaintiff's place of work is insufficient."[60]

However, the Fifth Circuit employs a gentler standard and, in *Slaughter v. Southern Talc Co.*,

> "inferred proximity to products from purely circumstantial evidence similar to the evidence in this case."[61] "In *Whatley v. Armstrong World Industries*, 861 F.2d 837 (5th Cir. 1988), for instance, [the Fifth Circuit] upheld a jury's allocation of fault for plaintiff's asbestos-related injury, even though there was no direct evidence that the plaintiff had worked with the defendants' products."[62]

Under this standard, summary judgment is improper on the current record for the majority of movants. The Court will address the relevant evidence specific to each movant below.

### C.  Tate Andale, Inc. – Successor Liability

Tate Andale moved for summary judgment on successor liability[63] and, alternatively, for lack of evidence of product identification and exposure.[64]  Because the Court finds that Tate-Andale is not liable in this matter as the successor to Andale, the Court need not reach the merits of the lack of evidence motion.

Plaintiffs allege that, during McAllister's tenure in the Navy, from 1964 to 1972, he was exposed to respirable asbestos based products manufactured by the Andale Company.[65]  Plaintiffs filed suit against Tate Andale, alleging that Tate Andale is the successor in interest to the Andale Company, and therefor is liable for the tort liabilities

---

[60] *Id.* at 492 (considering causation for asbestos exposure under maritime law).
[61] *Slaughter v. S. Talc Co.*, 949 F.2d 167, 172 (5th Cir. 1991).
[62] *Id.*
[63] Rec. Doc. No. 233.
[64] Rec. Doc. No. 228.
[65] Rec. Doc. No. 233, p. 8 (citing Rec. Doc. No. 1-1 ¶ 7); *See* Rec. Doc. No. 287 pp. 3-5.

of the Andale Company.[66]

Tate Andale was incorporated on October 30, 1957 as Temco Machine Works[67] and subsequently changed its name to Tate Temco, Inc. ("Tate Temco") on June 1, 1966.[68] On February 25, 1985, Tate Temco, a Maryland corporation, and the Andale Company, a Pennsylvania corporation, signed an Asset Purchase Agreement (the "Purchase Agreement") that was executed in two parts.[69]  Tate Temco sought to acquire the Andale Company's product line of valves, strainers, and heat exchangers.[70]

At the first closing, as provided by the Purchase Agreement, Tate Temco acquired all of the Andale Company's parts and unit inventory, supplies, works-in-progress,[71] patterns and molds,[72] and other tangible and intangible personal property, including tradenames, patents, supplier and customer agreements, and the Andale company's goodwill and the right to use the name "Andale."[73]  However, the Agreement excluded the E-system business and all patterns and molds relating to the e-system business, as well as the Lansdale, Pennsylvania manufacturing plant.[74] But, as provided in § 7 of the Purchase Agreement, Tate Temco leased the "fixed assets" of the Andale Company, including the Lansdale, PA manufacturing plant, for a period of one year to learn the product line.[75] Upon the expiration of the one year lease agreement, the Landsdale, Pa. operations were transferred to Baltimore, Maryland to continue manufacturing of the

---

[66] *Id.* at p. 8 (citing Rec. Doc. No. 1-1 ¶ 2); Rec. Doc. No. 287 p. 2; *See generally* Rec. Doc. No. 1-1 ¶ 2.
[67] *Id.* at p. 10 (citing Rec. Doc. No. 233-1 at 29:20 - 24); Rec. Doc. No. 287, p. 12.
[68] *Id.* (citing Rec. Doc. No. 233-1 at 29:20 - 30:2).
[69] *Id.*; *see generally* Rec. Doc. No. 233-2 and 233-3; Rec. Doc. No. 287 p. 12.
[70] Rec. Doc. No. 233-1 at 37:15-16, Rec. Doc. No. 287-12 at 12:36:15-16.
[71] Rec. Doc. No. 233-2 § 2(a); Rec. Doc. No. 287-20 § 2(a).
[72] Rec. Doc. No. 233-2 § 2(b); Rec. Doc. No. 287-20 § 2(b).
[73] Rec. Doc. No. 233-2 § 2(c); Rec. Doc. No. 287-20 § 2(c).
[74] Rec. Doc. No. 233-2 § 4; Rec. Doc. No. 287 § 4.
[75] Rec. Doc. No. 233-1 at 45:18 – 46:9; Rec. Doc. No. 287 p. 14; Rec. Doc. No. 287-12 at 10:28:20-24.

product line.[76]

At the second closing, Tate Temco acquired all "fixed assets" of the Andale Company, except as provided under § 5(a) of the Purchase Agreement.[77]  Further, if the Andale Company sold any assets provided for under § 5(a) of the Purchase Agreement to a third party, then Tate Temco had matching rights for a period of 10 days.[78]  On the assumption of liabilities, § 9 of the Purchase Agreement provides:

> Buyer does not hereby and will not at the First Closing or the Second Closing assume any debts, liabilities or obligations of Seller, contingent or absolute, direct or indirect, known or unknown, matured or unmatured, including, without limitation, mortgages, lines of credit, notes, bonds, contract claims or obligations, accounts payable, taxes of any kind to any governmental body, bank or other loans and expenses (including accrued vacations), all of which shall remain the debts, liabilities, or obligations of Seller. Without limiting the generality of the foregoing, Buyer does not hereby hire any employees of Seller or assume any employment contracts or agreements to which Seller is a party.[79]

Notably, the two companies never had overlapping employees, management, capital, or insurance.[80]  Further, § 32 of the Agreement, upon which Plaintiffs heavily rely, provides: "This Purchase Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Pennsylvania, without regard to principles of conflicts of laws."

The day after the first closing, Tate Temco changed its name to Tate Andale, Inc. and has subsequently changed its name to Tate Andale, LLC.[81] On April 16, 1986, less

---

[76] *Id* at 46:3-14; Rec. Doc. No. 287-12 at 14:45:3-14.
[77] Rec. Doc. No. 233-2 § 4; Rec. Doc. No. 287-20 § 4.
[78] Rec. Doc. No. 233-2 § 5(b); Rec. Doc. No. 287-20 § 5(b).
[79] Rec. Doc. No. 233-2 § 9; Rec. Doc. No. 287-20 § 9.
[80] Rec. Doc. No. 233-2 § 11(h);
[81] Rec. Doc. No. 233, p. 11; Rec. Doc. No. 287 p. 14.

than one year after the second closing, the Andale Company filed paperwork with the Pennsylvania Department Corporations Bureau to begin the dissolution process,[82] and the Andale Company was ultimately dissolved on October 12, 1988.[83]

Tate Andale moves for summary judgement, arguing it cannot be held liable under the theory of successor liability for any damages resulting from any pre-1985 exposure to asbestos-containing products sold by the Andale company.[84] Tate Andale contends that none of the successor liability exceptions apply in this matter; thus, it cannot be held liable because: (1) they did not expressly or impliedly agree to assume the Andale Company's debt under the purchase agreement;[85] (2) Tate Andale is not a mere continuation of the Andale Company because they were separate corporations, they did not have common shareholders, directors, officers, or employees, and because Tate Andale did not purchase *all* the assets of the Andale Company;[86] and (3) the transaction was not entered into to escape liability because the contingent tort liabilities did not exist at the time the 1985 purchase agreement was executed.[87]   Tate Andale further asserts that the applicable law regarding successor liability is the law of the State of Louisiana.

Plaintiffs oppose this motion, arguing that Tate Andale is the successor in interest to the Andale Company because Tate Andale purchased its goodwill, the "Andale" name, and the entire filtration equipment "product line," including engineering drawings, equipment manuals for the product lines purchased,[88] and the insurance policies,[89]

---

[82] Rec. Doc. No. 287, p. 14-15.
[83] *Id.* at p. 15.
[84] Rec. Doc. No. 233, p. 12.
[85] *Id.*
[86] *Id.* at p. 15.
[87] *Id.* at p. 17.
[88] Rec. Doc. No. 287, p. 2.
[89] This matter is currently in litigation in another lawsuit pending in the District Court of Maryland, *See* Rec.

including those that cover products liability claims. Further, Plaintiffs contend Pennsylvania law is applicable because the choice of law provision, § 32 of the Purchase Agreement between Tate Temco and the Andale Company, provides that the agreement shall be governed and construed in accordance with the laws of Pennsylvania.[90] In the alternative, even if the choice of law provision is not applicable, Plaintiffs claim application of the Louisiana Civil Code articles governing conflicts of law results in the application of Pennsylvania law.[91]

1.    Successor Liability, Generally

In *Golden State Bottling Co. v. National Labor Relations Board*, the United States Supreme Court set forth the basic tenants of successor liability:

> [T]he general rule of corporate liability is that, when a corporation sells all of its assets to another, the latter is not responsible for the seller's debts or liabilities, except where (1) the purchaser expressly or impliedly agrees to assume the obligations; (2) the purchaser is merely a continuation of the selling corporation; or (3) the transaction is entered into to escape liability.[92]

Some courts have adopted additional bases on which to impose successor liability, including Pennsylvania, upon which Plaintiffs rely.[93]

The Commonwealth of Pennsylvania has adopted additional successor liability exceptions, in addition to the basic tenants of successor liability articulated by the Supreme Court.[94] Pennsylvania has expressed the goal of protecting the otherwise defenseless victim by spreading the costs associated with their compensation throughout

---

Doc. No. 233-1 at 47:12-48:18, Rec. Doc. No. 287-12 at 15:46:12-47:18.
[90] Rec. Doc. No. 287 p. 2.
[91] Rec. Doc. No. 323 p. 3.
[92] 414 U.S. 168, 182 n.5, 94 S. Ct. 414, 38 L.Ed.2d 388 (1973).
[93] *See Dawejko v. Jorgensen Steel Co.*, 390 Pa. Super. 15 (1981); *Ray v. Alad Corp.*, 19 Cal.3d 22 (1977).
[94] *See id.* at 18 (citing *Husak v. Brekel Inc.*, 234 Pa. Super. 452, 456-57 (1975)).

society.[95] These additional exemptions of successor liability include transactions that amount to a consolidation or merger, and where a transfer occurs without adequate consideration.[96] Additionally, in *Dawejko v. Jorgen Steel Co.,* Pennsylvania adopted another exemption known as the "product line exemption."[97] This additional exemption functions as a means for a plaintiff to seek redress from a successor corporation, in a means consistent with the social policies underlying strict products liability, when a plaintiff has been injured by a defective product from a predecessor corporation.[98] *Dawejko v. Jorgen Steel Co.* provides:

> [W]here one corporation acquires all or substantially all of the manufacturing assets of another corporation, even for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the selling corporation is strictly liable for injured caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.[99]

Under Pennsylvania law, a court may consider various factors that can justify the imposition of successor liability under the product line exception, including: whether the successor corporation advertises itself as an ongoing enterprise; whether it maintained the same product, name, personnel, property, and clients; whether it acquired the predecessor corporation's name and good will, and if it required the predecessor to dissolve.[100]  Additionally, a court may, but is not bound to, analyze the *Ray v. Alad Corp.* factors adopted by Pennsylvania courts in determining the imposition of successor

---

[95] *Id.* at 22 (citing *Ray v. Alad Corp*, 19 Cal.3d at 30-31).
[96] *Id.* at 18.
[97] *Id.* at 26.
[98] *Id.* (citing *Ramirez v. Amsted Indus., Inc.*, 86 N.J. 332, 358 (1981)).
[99] *Id.*
[100] *Id.* at 26.

liability.[101]

Louisiana, on the other hand, has adopted the general successor liability tenants as set forth by the Supreme Court of the United States in *Golden State Bottling*.[102] Unlike Pennsylvania, Louisiana has declined to adopt the "product line exemption."[103] In *Bourque v. Lehmann Lathe, Inc.*, the Louisiana state court refused to adopt the "product line exemption" under the specific facts of the case, but it did not expressly reject the theory. In Louisiana, successor liability law recognizes the importance of victim compensation but also heavily applies the principle that the one responsible for the tort should be the one to compensate the victim.[104]

Federal courts in Louisiana have confirmed that Louisiana does not recognize the "product line exception. For example, in *Murray v. B&R Mach*,[105] the United States District Court for the Eastern District of Louisiana addressed similar facts as those presented herein:  no common shareholders, directors, or officers, but some common employees. Finding the defendant was not a "mere continuation" of the previous, the court noted:

[101] *Schmidt v. Boardman Co.*, 608 Pa. 327, 359-62 (2011). In *Hill v. Trailmobile Inc.*, 603 A.2d 602, 606 (Pa. Super 1992) *abrogated by Schmidt v. Boardman Co.*, 608 Pa. 327 (Pa. 2011), the court adopted additional factors from *Ray v Alad Corp.*, 560 P.2d 3 (Cal. 1977), requiring (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business. However, in *Schmidt v. Boardman Co.*, 608 Pa. 327 (Pa. 2011) the Supreme Court of Pennsylvania reversed course and no longer requires the mandatory inclusion of these factors in a successor liability analysis, consistent with the *Dawejko v. Jorden Steel Co.* opinion that did not mandate these factors.
[102] *AMEC Constr. Mgmt., Inc. v. Fireman's fund Ins. Co.*, 2014 WL 1875264, at *3 (M.D. La. May 9, 2014)(quoting *Pichon v. Asbestos Defendants*, 2010-0570 (La. App. 4 Cir. 11/17/10), 52 So.3d 240, 243 *writ denied*, 2010-2271 (La. 2/4/11), 57 So.3d 317).
[103] *Bourque v Lehmann Lathe, Inc.*, 476 So. 2d 1125, 1127 (La. App. 3 Cir. 1985); *see also Pichon*, 52 So.3d at 248 n.4.
[104] *Id.* at 1129.
[105] 1995 WL 133346 (E.D. La. Mar. 24, 1995).

"Plaintiffs attempt to make much of [the employees] and they focus on the fact that B & R has engaged in the same business as Davis did before the sale."[106] The court rejected the argument, noting that the fact that the corporation had "shared employees" or was engaged in a similar "product line" was not the correct standard under Louisiana law,[107] and explained the distinction between the "mere continuation" exception and the "product line exception:"

> Adopting plaintiff's argument would obliterate the distinction between the mere continuation exception and the product line exception. The mere continuation exception is designed to impose liability on the successor when it is, in fact although not in law, the same corporation, with the same ownership and control, as its predecessor. The product line exception ignores the traditional rules of corporate liability and focuses instead on the continued manufacture, by the successor, of the products manufactured by the predecessor.[108]

The *Murray* court ultimately concluded:  "The Louisiana courts have not adopted the product line theory of liability," and, because few other jurisdictions had adopted the theory, it declined to create law by imposing the product line exception in lieu of the "mere continuation exception."[109]  Tate Andale maintains the same result is warranted here.[110]

### 2.    Analysis of § 32 of the Purchase Agreement

Plaintiffs argue § 32 of the Purchase Agreement make clear that Pennsylvania law applies to this case for purposes of determining successor liability, and there is no conflict of laws. This section provides:

---

[106] *Id.* at *5.
[107] *Id.*
[108] *Id.* at *5 (citing *Bourque*, 476 So.2d at 1128 (citing *Ray*, 560 P.2d 3)).
[109] *Id.*
[110] Tate Andale notes: "To date, the 'product line' theory of successor liability has not been adopted by other courts applying maritime law. *Royal Ins. Co. v. Smatco Indus. Inc.*, 201 B.R. 755, 759 n.1 (E.D. La. 1996)." Rec. Doc. No. 233, p. 16.

**32. Integration, Interpretation & Miscellaneous**

This Purchase Agreement and any agreement specifically referred to herein set forth the entire understanding of Seller and Buyer and supersede all prior agreements and understandings, oral and written, between Seller and Buyer with respect to the subject matter hereof. This Purchase Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Pennsylvania, without regard to principles of conflicts of law.[111]

Tate Andale maintains that, to the extent that § 32 supports the application of Pennsylvania law, the provision pertains only to the interpretation of the Purchase Agreement itself and not to the law surrounding successor liability in the context of tort actions brought by Louisiana citizens in Louisiana courts.   Tate Andale notes that Pennsylvania law specifically recognizes that the contractual choice of law does not apply in determining successor liability in such cases.[112] Indeed, in *Berg Chilling Systems, Inc.*, the Third Circuit explained:

> In general, while it makes sense to allow the parties to a contract to control which law applies to their agreement, **it does not follow that the contract provisions should control an inquiry that, by its nature, looks beyond the contract.** In a strict Restatement analysis, we would be guided towards giving effect to the contractual choice of law by considerations such as protecting the parties' justified expectations and assuring certainty, predictability and uniformity of results. **These factors, however, do not apply to the equitable application of successor liability**. Here, there is no protection of justified expectations because SPI and Berg did not bargain with each other; Berg brought a third-party action. Even when we consider that SPI and Hull bargained over the provisions of the Asset Purchase Agreement, **the fact remains that they bargained for New Jersey law to apply to interpretation of the provisions of the contract, not to their**

---

[111] Rec. Doc. No. 295-2.

[112] Rec. Doc. No. 308, p. 5 n. 16:   "*See Berg Chilling Systems, Inc. v. Hull Corp*, No. 04-3589, 435 F.3d 455, 465-66 (3d Cir. 2006)(citing *SmithKline Beecham Corp. v. Rohm & Haas Co.*, 89 F.3d 154, 162 (3d Cir. 1996) (using law chosen by contract to interpret contract terms, but engaging in Pennsylvania choice of law analysis to determine successor liability); *Source One Enterprises v. CDC Acquisition Corp.*, 2004 WL 1453529 at *1 (D. Minn. June 24, 2004) (indicating that contractual choice of law clause did not apply to successor liability); *East Prairie R-2 School District v. U.S. Gypsum Co.*, 813 F. Supp. 1396 (E. D. Miss. 1993) (using the Restatement-based choice of law rules of Missouri to determine that, while contractual choice of law clause applied to contract terms, Mississippi law controlled successor liability issue)."

**real-world effect.** In short, the nature of an inquiry into the *de facto* merger exception to successor liability speaks against following the [Asset Purchase Agreement's] choice of law provision. As we acknowledged in *Polius*, the court steps in "when the form of the transfer does not accurately portray substance." **Ultimately, in conducting choice of law analysis for this situation, we should look to the substance of the transaction, rather than to the form of the agreement; therefore, the [Asset Purchase Agreement's] choice of law provision does not control.**[113]

Tate Andale also urges the Court to consider the fact that McAllister was not a party to the contract between Tate Temco and The Andale Company, and the choice of law provision relied upon by Plaintiffs only purports to bind the contract parties in term of which law governs the contract itself; "it does not purport to govern all claims arising out of the parties' contractual relationship, or claims brought forth by strangers to the contract."[114]

In response to Tate Andale's argument regarding the application of *Berg*, Plaintiffs simply stated that "Tate Andale's citation to non-controlling case law misapprehends the substantive and legal effect of the contractual choice of law provision in the Tate Temco/Andale Purchase Agreement as it applies to this case."[115]  Plaintiffs failed to distinguish *Berg* and do not offer any argument as to how Tate Andale has "misapprehend[ed]" the analysis and conclusion in *Berg* regarding a choice of law provision in this type scenario. The Court is persuaded that the choice of law provision in the Purchase Agreement does not extend to this third-party tort claim. The Court concludes that § 32 of the Purchase Agreement does not mandate the application of Pennsylvania successor liability law to this case, the Court turns to a conflict of laws

---

[113] *Berg Chilling Systems, Inc.*, at 466 (citations omitted) (emphasis added).
[114] Rec. Doc. No. 308, p. 6.
[115] Rec. Doc. No. 323, p. 3.

analysis.

3.    Conflicts of Laws

Courts shall apply choice-of-law analysis when laws of competing jurisdictions are actually in conflict. As such, the first step in this analysis is to determine whether there is actually a conflict of law. If a conflict is found to exist, a district court exercising diversity jurisdiction must apply the conflict of law analysis that would be applied by the courts of the state in which it sits, in this instance Louisiana.[116] The present matter is not a diversity action, but was removed on the basis of federal officer jurisdiction pursuant to 28 U.S.C. § 1442(a). Although this is not a diversity action, "[a] federal court's rule under § 1442(a) is similar to that of a federal court sitting in diversity."[117]

The Louisiana general choice of law statute is found in Civil Code Article 3515.[118] This article provides the rules for resolving a dispute over the applicable law:

> Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
>
> That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more

---

[116] *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 494-97 (1941).

[117] *Kolibash v. Committee on Legal Ethics of West Virginia Bar*, 872 F.2d 571, 576 (4th Cir. 1989); *Baird v. Fed. Home Loan Mortg. Corp.*, Civil Action No. 3:15CV00041, 2016 WL 6583732, at *2 (W.D. Va. Nov. 4, 2016) ("'federal court's role under § 1442 is similar to that of a federal court sitting in diversity'" with court applying "choice of law rule in the forum state") (citations omitted), *aff'd*, 706 Fed. Appx. 123 (4th Cir. 2017 (unpublished); *Baldonado v. Arinmeritor, Inc.*, Civil Action No. 13-833-SLR-CJB, 2014 WL 2116112, at *3 (D. Del. May 20, 2014) (applying "choice of law rule of the forum state" in action removed under section 1442(a)); *See Arizona v. Manypenny*, 101 S. Ct. 1657, 1664-65 (1981); *Van Dusen v. Barrack*, 376 U.S. 612, 640 (1964*); Crase v. Astroworld, Inc.*, 941 F.2d 265, 267 (5th Cir. 1991).

[118] Both parties agree that this is the appropriate statute to apply – see Rec. Doc. No. 308 and 323.

than one state.[119]

Additionally, Louisiana Code Article 3542 addresses the resolution of conflict of law matters relating to delictual and quasi-delictual obligations. The article provides that:

> Except as otherwise provided in this Title, an issue of delictual or quasi-delictual obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
>
> That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the events giving rise to the dispute, including the place of conduct and injury, the domicile, habitual residence, or place of business of the parties, and the state in which the relationship, if any, between the parties was centered; and (2) the policies referred to in Article 3515, as well as the policies of deterring wrongful conduct and of repairing the consequences of injurious acts.[120]

Plaintiff argues that, even if this action is not governed by § 32 of the Agreement, it is still governed by Pennsylvania law regarding successor liability after application of Louisiana Civil Code Arts. 3515 and 3542. To resolve this matter, the Court must: (1) determine if an actual conflict of laws exists, (2) examine the pertinent contacts to each jurisdiction with respect to the issue, (3) identify the competing policies underlying the law implicated in the choice of law discussion, and (4) evaluate the "strength and pertinence" of these policies in light of the relationship of each state to the parties and the dispute, and in light of policies and needs of interstate and international systems.[121]

Clearly, an actual conflict exists between Pennsylvania and Louisiana law on successor liability.  Next, the Court evaluates the Parties' pertinent contacts to each jurisdiction.   Tate Andale argues that the policies of Louisiana would be most seriously

---

[119] La. C.C. Art. 3515.
[120] La. C.C. § 3542.
[121] *Marchesani v. Pellerin-Minlor Corp.* 269 F.3d 481 (5 Cir. 2001). (These principles relate to the delictual and quasi-delictual choice of law analysis).

impaired if its law were not applied, and the relationship of each state to the Parties and the dispute favors application of Louisiana law.  Here, McAllister testified that he was born in Virginia and resided there until he graduated high school in June 1964.[122]  He soon enlisted in the Navy and returned to Virginia before moving to New Orleans in January of 1975.[123]  He remained in Louisiana for nearly 45 years until his death.[124]  Further, McAllister's wife, who has been substituted as a Plaintiff in this matter, continues to reside in Louisiana.[125]  McAllister filed this lawsuit against various Defendants, including Tate Andale, in Louisiana.[126]  Additionally, all of McAllister's treatment for his diagnosis occurred in Louisiana.[127]  In contrast to these many contacts with Louisiana, Tate Andale notes that Pennsylvania has no relationship to this dispute, and neither Plaintiffs nor Tate Andale have any contacts with Pennsylvania. Tate Andale is a Maryland corporation with its primary place of business in Baltimore, Maryland.[128]

Further, Tate Andale maintains that consideration of the policy interests of each state also supports applying Louisiana law:

> Louisiana has a significant interest in applying its own laws to its citizens, including the Plaintiffs in this case. On the other hand, no policy of Pennsylvania would be seriously impaired were Louisiana law applied to this dispute, especially since (1) the Pennsylvania domiciliary party to the Purchase Agreement is no longer in existence, and is not a party here, (2) the performance of the contract has been completed and (3) the other party to the contract, Tate, is domiciled in Maryland. Considering these factors, this Court should find that Louisiana has a greater interest in applying Louisiana law to Mr. McAllister's successor liability claims against Tate.[129]

---

[122] Rec. Doc. No. 295-6, McAllister Depo, Volume I, at 18:7-14.
[123] *Id.* at 22:16-13.
[124] *Id.* at 18:17-19:8.
[125] *Id.*, at 18:17-18; 18:25-19:8.
[126] McAllister originally filed suit in the Nineteenth Judicial District Court for the Parish of East Baton Rouge.
[127] Rec. Doc. No. 295-6 at 219:22-225:3
[128] Rec. Doc. No. 295-3, Deposition of Robert Tate, at 29:12-14; 23:13-16.
[129] Rec. Doc. No. 308, pp. 3-4.

Plaintiffs claim "Tate Andale inexplicably ignores the relevant and critical contacts the parties have to Pennsylvania in favor of contacts that have little to no bearing on the successor liability of two foreign corporations."[130]   Plaintiffs argue that Tate Andale erroneously looks only to the relationship between the Parties relationship to Louisiana instead of focusing on the fact that the asbestos-containing valves allegedly causing McAllister's injuries were manufactured in Pennsylvania, and this product line was purchased from Andale, a Pennsylvania company.  Plaintiffs insist these are the relevant contacts for a choice of law determination regarding successor liability.

Considering the arguments advanced and after applying the conflict of laws factors set forth above to the facts of this case, the Court finds that Louisiana law should apply in this matter.  Although the allegedly injurious valves were manufactured in Pennsylvania, Pennsylvania has no other relationship to this case.  Tate Andale is one of several defendants in this matter, making Pennsylvania law even more removed from the law to apply.  No Pennsylvania citizen, company, law, or public policy will be affected or impaired by applying Louisiana law to this case.  Further, the Parties' contacts with and the policies of the State of Louisiana are heavily present and impacted in this matter. Louisiana has significant interests in protecting its citizens, and a great deal of evidence relating to McAllister's alleged injuries was developed in Louisiana.  Plaintiffs have also admitted in several briefs to this Court that, although general maritime law applies in this case, in several circumstances, Louisiana law will apply.

The Court finds that Louisiana law applies to this case and there is no "product line

---

[130] Rec. Doc. No. 323, p. 2.

exception" to Louisiana law on successor liability.  Considering the undisputed facts of this case, Tate Andale cannot be held liable under successor liability principles; therefore, Tate Andale's *Motion for Summary Judgment on Successor Liability*[131] is GRANTED. The *Motion for Summary Judgment Based on Lack of Evidence of Product Identification or Exposure*[132] is DENIED as moot.

### D.  Spirax Sarco

In its motion, although Spirax Sarco acknowledges that it designs, manufactures and sells steam traps for use in steam systems, it claims that the best Plaintiffs can do is allege that McAllister may have come into contact with asbestos-containing materials specified by the U.S. Navy that were on products not supplied or specified by Spirax Sarco but may have been adjacent to products supplied by Spirax Sarco.[133]  Spirax Sarco claims it is undisputed that McAllister never came in contact with any asbestos-containing material allegedly supplied by Spirax Sarco.  Spirax Sarco directs the Court to McAllister's deposition testimony where he did identify Spirax Sarco as one of the manufacturers of steam traps that he came across while serving in the U.S. Navy,[134] but he was not exposed to the interior of any steam trap, regardless of the alleged manufacturer, because McAllister did not rebuild steam traps; rather, he removed old steam traps and replaced them with new steam traps.[135]  McAllister testified that he never saw a tech manual for a steam trap.[136]

---

[131] Rec. Doc. No. 233.
[132] Rec. Doc. No. 228.
[133] Rec. Doc. No. 232-1, p. 6.
[134] McAllister Depo., Vol I at 97.
[135] *Id.* at 214-215; Vol II at 466.
[136] *Id.,* Vol II at 461-462.

Noting that McAllister testified that his only involvement in relation to any potential asbestos exposure around steam traps was that he claimed to have scraped the remnants of flange gaskets off of steam pipes connecting the steam traps to the steam system during the removal and replacement,[137]  McAllister and others also testified that the sheet gasket material used by Navy personnel to replace gasket material on pipe flanges was not specified or manufactured by Spirax Sarco.[138]  As the sheet gasket material used by McAllister was specified and supplied to the U.S. Navy by others, Spirax Sarco contends it had no involvement whatsoever in the specification and supplying of sheet gasket material.

Further, Spirax Sarco contends that, to the extent any steam trap supplied to the U.S. Navy by Spirax Sarco had any asbestos-containing material in the interior gasket, a person would have to physically open and disassemble the trap to become exposed to the interior gasket.[139]  Because McAllister testified he did not engage in this process, Spirax Sarco argues it is entitled to summary judgment.

Plaintiffs counter Spirax Sarco's presentation of facts, arguing that genuinely disputed material facts exist regarding McAllister's exposure to asbestos as a result of working on Spirax Sarco steam traps.  McAllister testified that he worked with and around asbestos gaskets, packing, and insulation while maintaining steam traps, valves and pumps,[140] and, because preformed gaskets were unavailable, they had to cut custom

---

[137] *Id.*, Vol I at 215; Vol II at 466-467.

[138] *Id.,* Vol II at 470; Rec. Doc. No. 232-5, Deposition of James P. Delaney, CDR/USN (retired) at 50; Rec. Doc. No. 232-6, Deposition of Arnold P. Moore, P.E., at 299-300.

[139] Rec. Doc. No. 232-7, Deposition of Spirax Sarco, Inc., Bernard J. Radle Corporate Representative, at 87-88.

[140] McAllister Deposition, Vol I, at 30:20-31:17; 33:06-23; 61:06-62:15.

asbestos gaskets from sheet material—a process that created dust to which McAllister was exposed.[141] McAllister was also exposed removing old asbestos gaskets from equipment and flanges using a scraper, wire brush or pneumatic wire brush.[142] McAllister replaced gaskets in this manner on steam traps, valves, and pumps on numerous occasions, and even when he was not, others around him were, which continuously exposed him to dust.[143]

McAllister testified that he specifically recalled working with Sarco traps aboard the *TRITON* and the *STURGEON* because he remembered the name embossed on the product.[144] McAllister also testified that his work on all steam traps, including Sarco's, involved disconnecting an old trap, scraping asbestos gaskets from the tie-in flanges, and installing a new trap using the tools and techniques described.[145] McAllister recalled being trained to handle Sarco steam traps in machinist mate school, and he recalled that Sarco manuals specified using asbestos gaskets because of the high temperatures at which the steam traps operated.[146] McAllister did not recall seeing any warning in the Sarco manuals and never received any warnings generally regarding asbestos hazards while in the Navy.[147]

Plaintiffs also argue that, under the Supreme Court's recent decision in *Air & Liquid Systems Corp. v. DeVries*,[148] Spirax Sarco's argument that it has no liability for

---

[141] *Id.* at 52:05-53:18; 53:05-18, 56:01-57:10.
[142] *Id.* at 56:01-58:24.
[143] *Id.* at 58:25-62:15; 76:17-24; 254:15-23; 85:09-20; 108:23-21; 111:13-20; 115:24-116:13.
[144] McAllister Deposition, Vol. II at 467:04-469:02.
[145] McAllister Deposition, Vol. I at 61:06-62:15; 214:06-215:18; Vol. II at 466:18-22; 469:16-470:01; 473:12-21.
[146] McAllister Deposition, Vol. II at 470:05-20; Vol. I at 215:19-22; 215:23-216:08; 215:19-216:04.
[147] *Id.* at 217:22-218:11; 218:12-20; 216:16-18; 219:05-07; 216:19-217:16; 217:22-218:11.
[148] 139 S. Ct. 986 (2019).

McAllister's exposure to asbestos-containing products connected to its product in order to function properly is meritless.  In *DeVries*, the Supreme Court considered the scope of a manufacturer's duty to warn in the context of maritime tort law.[149]    The manufacturers had produced pumps, blowers, and turbines for Navy ships, which in the Court's description, "required asbestos insulation or asbestos parts in order to function as intended."[150]  The Supreme Court rejected "the more defendant-friendly bare metal defense" which provided that "[i]f a manufacturer did not itself make, sell, or distribute the part or incorporate the part into the product, the manufacturer is not liable for harm caused by the integrated product...."[151]  On the other hand, the Supreme Court found that "foreseeability that the product may be used with another product or part that is likely to be dangerous is not enough to trigger a duty to warn.  But a manufacturer does have a duty to warn when its product requires incorporation of a part and the manufacturer knows or has reason to know that the integrated product is likely to be dangerous for its intended uses."[152]  The standard the Supreme Court announced requires that a product manufacturer has a duty to warn "when (i) its product requires incorporation of a part, (ii) the manufacturer knows or has reason to know that the integrated product is likely to be dangerous for its intended uses, and (iii) the manufacturer has no reason to believe that the product's users will realize that danger."[153]

Spirax Sarco acknowledges the *DeVries* decision but weakly attempts to argue that its holding does not preclude summary judgment in its favor in this case.  Spirax

---

[149] *Id.* at 991.
[150] *Id.*
[151] *Id.* at 994 (citing *Lindstrom v. A-C product Liability Trust*, 424 F.3d 488, 492 (6th Cir. 2005)).
[152] *Id.* at 993-94.
[153] *Id.* at 996.

Sarco focuses on the foreseeability holding in *DeVries* and contends that *DeVries* "has has no bearing on the facts and circumstances that relate to [McAllister's] alleged injury because the alleged asbestos-containing materials to which [McAllister] was allegedly exposed were not components that were integrated into a Spirax Sarco steam trap."[154] Spirax Sarco maintains that, "while *Devries* may have departed from some traditional products liability warning concepts, it did not go so far as to require a manufacturer of one product to warn about potential dangers of some other manufacturer's products simply because that other product might be adjacent to the first manufacturers' product."[155]  Additionally, Spirax Sarco argues that "its steam traps are merely a small component in a much larger and more complex steam generating and distribution system,"[156] and "the asbestos-containing materials that caused [McAllister's] injuries were not integrated into or on a Spirax Sarco steam trap or necessary for its operation."[157]

However, of the three identified steam traps made by Spirax Sarco specifically for the Navy, Plaintiffs have presented evidence that their use in conjunction with flange gaskets was clearly contemplated.  Spirax Sarco acknowledges that it sold three types of steam traps for use aboard nuclear submarines - the FD2, the TDN, and the TM600N – which were made specifically for and sold only to the Navy.[158] Spirax Sarco maintains it never recommended that a steam trap should be insulated.[159]  But, as to the FD2,

---

[154] Rec. Doc. No. 232-1, p. 19.
[155] *Id.* at p. 20.
[156] *Id.*
[157] *Id.* at p. 21.
[158] Rec. Doc. No. 232-7, Deposition of Spirax Sarco, Inc., Bernard J. Radle Corporate Representative, at 80, 90, 94, 95-96.
[159] *Id.* at 102.

Bernard J. Radle ("Radle"), Corporate Representative for Spirax Sarco, admitted that Spirax Sarco knew of the potential need to replace asbestos-containing flange gaskets if they happened to leak.[160]  Radle testified that the TDN and TM600N traps required the same flange gaskets.[161]  Thus, Plaintiffs contend Spirax Sarco knew that when flange gaskets began to leak, the customer would need to replace them, and in doing so, one had to be sure to completely remove and clean the old asbestos gasket residue on the surface.[162]  Moreover, Plaintiffs submit a reference published by Spiraxo Sarco around 1968 entitled *Hook-up Designs For Steam and Fluid Systems*,[163] which Plaintiffs argue shows that Spirax Sarco was "more than a passive provider of a piece of equipment, but rather was involved in and knowledgeable as to how its traps should be integrated into various systems."[164] Considering this evidence, the Court finds that there are material issues of fact regarding causation and McAllister's alleged exposure to asbestos by handling Spirax Sarco steam traps during the relevant time period.

Spirax Sarco also claims it is shielded from the liability by the governmental contractor defense.  The governmental contractor defense is an affirmative defense that was established by the Supreme Court in *Yearsley v. W.A. Ross Constr. Co.*[165] and then expanded in *Boyle v. United Techs. Corp.*[166]  This defense provides "immunity to contractors for conduct that complies with the specifications of a federal contract."[167]

---

[160] Rec. Doc. No. 283-12, pp. 114-116.
[161] *Id.* at pp. 91-93.
[162] *Id.* at pp. 114-118.
[163] Rec. Doc. No. 283-18.
[164] Rec. Doc. No. 283, p. 8 (citing Rec. Doc. No. 283-18 at pp. I 2 – I 3 (preface and contents showing extent of topics covered by Sarco); pp. II 1 – II 7, II 22 – II 27 (examples diagrams and schematics showing how to integrate Sarco traps into various systems)).
[165] 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940).
[166] 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988).
[167] *Crutchfield v. Sewerage and Water Board of New Orleans*, 829 F.3d 370, 375 (5th Cir. 2016).

Under this defense, immunity attaches if the defendant can establish that: (1) the government approved reasonably precise specifications; (2) the equipment or work conformed to those specifications; and (3) the contractor warned the government about any dangers that were known to the contractor but not to the government.[168]

The first prong of this test has two requirements: reasonably precise specifications and government approval—"which together are intended to 'assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself.'"[169] Reasonable precision requires "that the discretion over significant details and all critical design choices be exercised by the government."[170] Here, the focus is not on the designer of the harmful feature of the project but rather on the detail of the specifications presented to the government for approval.[171] Likewise, "[t]he government need not prepare the specifications to be considered to have approved them."[172] "Government approval simply requires meaningful, substantive review of the specifications."[173]

Spirax Sarco provides scant evidence to support its entitlement to this defense. Indeed, Spirax Sarco cites only to Radle's testimony, which establishes that the three

---

[168] *Sewell v. Sewerage & Water Bd. of New Orleans*, No. CV 15-3117, 2016 WL 7385701, at *3 (E.D. La. Dec. 21, 2016), *aff'd*, 697 F. App'x 288 (5th Cir. 2017); *In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 460 (5th Cir. 2010); *Wilde v. Huntington Ingalls, Inc.*, 616 Fed.Appx. 710, 715 (5th Cir. 2015).

[169] *Sewell*, 2016 WL 7385701, at *3 (quoting Boyle, 487 U.S. at 512, 108 S.Ct. 2510).

[170] *Trevino v. General Dynamics*, 865 F.2d 1474, 1481 (5th Cir. 1989); *see also Kerstetter v. Pacific Scientific Co.*, 210 F.3d 431, 435, 438 (5th Cir. 2000) (finding that specifications are reasonably precise "as long as the specifications address, in reasonable detail, the product design feature, alleged to be defective.").

[171] *See In re Aircraft Crash Litigation Frederick, Maryland*, 752 F.Supp. 1326, 1341-42 (S.D. Ohio 1990) *aff'd*, *Darling v. Boeing Co.*, 935 F.2d 269 (6th Cir. 1991).

[172] *Kerstetter*, 210 F.3d at 435 (citing *Trevino*, 865 F.2d at 1480 (5th Cir. 1989)).

[173] *Sewell*, 2016 WL 7385701, at *3; *see also Trevino*, 865 F.2d at 1480, 1486; *Stout v. Borg-Warner Corp.*, 933 F.2d 331, 335-36 (5th Cir. 1991) (explaining that the government's substantive review of specifications is sufficient, but rubber stamping is not).

steam traps identified above were designed specifically for the Navy. That, however, does not satisfy the prongs of the *Boyle* test set forth above. When asserting an affirmative defense, the asserting party must present evidence demonstrating its entitlement; only if it does so does the burden shift to the plaintiff to raise a genuine issue of fact regarding the defense.[174] Radle's testimony fails to meet Spirax Sarco's burden. Spirax Sarco has not submitted evidence of its contract with the Navy to produce these products; evidence of the precise governmental specifications required in their production; evidence that Spirax Sarco's traps conformed to such unidentified specifications; or evidence that Spirax Sarco warned the Navy about any dangers it knew about the product, if applicable. Spirax Sarco is not entitled to summary judgment on the governmental contractor defense on the current record before the Court.

Accordingly, Spirax Sarco's *Motion for Summary Judgment* is DENIED.

### E.  Velan Valve

Defendant Velan Valve has also moved for summary judgment, arguing that Plaintiffs have failed to identify any Velan products on board the vessels at issue and failed to present evidence that McAllister was ever exposed to asbestos from proximity to a Velan product.

Plaintiffs claim that their naval expert and licensed professional engineer Captain Arnold P. Moore, P.E. ("Captain Moore"), confirmed that Velan sold valves to the Navy for use aboard the *STURGEON*.[175]  Captain Moore testified that it was Velan who

---

[174] *See Smith v. Xerox Corp*, 866 F.2d 135 (5th. Cir. 1989).
[175] *See* Rec. Doc. No. 282-12, Expert Report of Arnold P. Moore, P.E., dated July 27, 2018, at 18; *see also* Rec. Doc. No. 282-13, Declaration of Arnold P. Moore, P.E., at ¶ 16.

advertised its products aboard the *STURGEON*,[176] and he observed that Velan utilized asbestos sheet gaskets and asbestos spiral wound metallic gaskets for most applications.[177]  Further, Plaintiffs point to the deposition testimony of Velan's corporate representative, Ewart Francois, in different lawsuit wherein he testified that Velan manufactured asbestos-containing valves and steam traps and sold these to the Navy during the relevant time period.[178]

Based on the foregoing, Plaintiffs claim that they have presented circumstantial evidence, as contemplated by *Slaughter*, sufficient to defeat summary judgment. Plaintiffs also disingenuously argue that their medical causation experts all agree that McAllister's exposure to Velan asbestos gaskets was significant and a substantial contributing factor in causing his mesothelioma.[179]  However, a close reading of the expert reports on causation reveals no references to Velan products.

The Court finds that Plaintiff has failed to present summary judgment evidence demonstrating a genuine issue of disputed fact regarding McAllister's exposure to Velan asbestos-containing products.  The possible presence of Velan products aboard the *STURGEON* is insufficient to make this evidentiary leap.  First, while McAllister specifically identified several product manufacturers during the course of his lengthy deposition, he never identified a Velan product.[180]  Second, the deposition testimony of

---

[176] See Rec. Doc. No. 282-15, Deposition of Arnold P. Moore, P.E., at 250:13-253:01.
[177] *Id.* at 264:04-20.
[178] *See* Rec. Doc. No. 282-14, Deposition of Francois in *Hays*, dated June 30, 2011, at 07:16-08:14; 16:25-17:11.
[179] Rec. Doc. No. 282, p. 7.
[180] *See* Rec. Doc. 282-3, Plaintiffs' Depo., p. 96, ln. 17 - 20 ("Okay, valves, Andale, A&W, Edwards, Crane, Powell, and Bell & Gossett."); p. 97 ("Not A&W, A&M."); p. 153, ln. 13 - p. 164, ln. 14 (specific discussions of work with Crane, A&M, Edward, Bell & Gossett, Powell, and Andale valves); p. 97, ln. 25 - p. 97, ln. 1 ("Q. Do you recall during your years serving in the Navy any of the brands of steam traps on which you worked? A. Armstrong, Yarway, and Sarco."); p. 213, ln. 23 - p. 216, ln. 8 (specific discussions of work with

Ewart Francois established no relevant facts in this case as he did not testify as to the presence of Velan products on either the *TRITON* or the *STURGEON* in the *Hays* litigation.[181]

Third, Captain Moore is not a fact witness, and he offered no testimony that McAllister worked on or around Velan asbestos-containing products.  Indeed, during Captain Moore's deposition, he could not cite to any naval records placing Velan products aboard the *STURGEON* during the pertinent dates of service.[182]   Captain Moore was also unable to identify in which system a Velan product may have been on the *STURGEON*[183] or where any Velan product may have been located on the vessel.[184] Most significantly, Captain Moore testified that he could not "testify that [McAllister] performed work on a Velan valve based upon [McAllister's] deposition testimony as I understand it."[185]

Finally, while Plaintiffs cite specific pages of causation expert reports that purport to implicate Velan products, these reports refer only generally to asbestos-containing gaskets.  As pointed out by Velan, in the expert report by Kenneth Garza, CIH, ("Garza"), Plaintiffs' expert in industrial hygiene, he did not specifically opine once in 48 pages about Velan products,[186] and Velan is not addressed by Garza in his 142-page deposition,[187] although Garza discussed and provided opinions on McAllister's work with

---

Armstrong, Yarway, and Sarco steam traps).
[181] *See* Rec. Doc. 282-14, Francois Depo., June 30, 2011, taken in the matter of *William Hays v. A.W. Chesterton, Inc., et al.*
[182] *See* Rec. Doc. 239-6, Moore Depo. p. 251, ln. 18 - p. 252, ln. 4.
[183] *Id.* at 261, lines 21-25.
[184] *Id.* at 262, lines 16-21.
[185] *Id.* at 265, lines 7-11.
[186] *See* Rec. Doc. 282-5, Expert Report of Kenneth Garza, CIH.
[187] *See* Rec. Doc. 282-6, Garza Depo.

"Atwood & Merrill, Edwards, Crane, Powell, Andale & Tate, and Bell & Gossett valves"[188] as well as "Armstrong, Yarway, and Sarco" steam traps.[189]  The same is generally true of the remaining causation experts, James Millette, Ph.D. ("Millette"),[190] Brent Staggs, MD, ("Staggs")[191] and Jacqueline Moline, MD, ("Moline")[192] in that they provide general discussion of exposure to gaskets and other products, and in some instances specifically reference manufacturers, but none ever specifically name Velan products in any report. Notably, all discussion and mention of the expert reports and opinions of Garza, Millette, Staggs, and Moline relate solely to the products identified by name in McAllister's deposition, and the Court agrees with Velan that, "[t]hose opinions cannot be extrapolated to any manufacturer of products that was not identified or addressed by any fact witnesses."[193]

Further, although Plaintiffs are correct that the Fifth Circuit allows circumstantial evidence of exposure to defeat summary judgment in asbestos cases, Plaintiffs have presented insufficient summary judgment evidence of the mere presence of Velan products somewhere on the *TRITON* or the *STURGEON*. Plaintiffs cite *Slaughter*, discussed *supra*, wherein the Fifth Circuit stated: "[t]he essence of plaintiffs' proof of exposure . . . rests on the common sense idea that, if defendants' products are likely to be present at a specific location within the workplace, plaintiffs are likely to have been exposed to the products if they worked near those specific locations, even without

---

[188] *Id.* at 38-39.
[189] *Id.* at 40-41.
[190] *See* Rec. Doc. 282-7, Expert Report of James Millette, Ph.D.
[191] *See* Rec. Doc. 282-8, Expert Report of Brent Staggs, MD; *see also* Rec. Doc. 282-9, Staggs Depo.
[192] *See* Rec. Doc. 282-10, Expert Report of Jacqueline Moline, MD; *see also* Rec. Doc. 282-11, Moline Depo.
[193] Rec. Doc. No. 307, p. 4.

explicit testimony that the plaintiff worked near the specific product."[194]  However, as Velan points out, *Slaughter* addressed a scenario wherein circumstantial evidence was allowed as to the inference of proximity of the product and the plaintiff – not the existence of the product on the work site.[195]  Moreover, the plaintiff in *Slaughter* had provided sales and delivery records documenting the specific exposure period in addition to the testimony of multiple witnesses regarding the use and disbursement of that specific product throughout the plant wherein the plaintiff worked.  Such is not the evidence in the present case. There is no summary judgment evidence in this matter establishing that Velan products were aboard the *TRITON* or the *STURGEON* during the relevant time period, much less that McAllister worked around or near Velan products such that there is an issue of fact that he suffered significant asbestos exposure from them.

Accordingly, the *Motion for Summary Judgment* Velan Valve Corporation[196] is GRANTED.

### F. Air & Liquid Systems Corporation, successor by merger to Buffalo Pumps, Inc.[197]

Air & Liquid Systems Corporation (a/k/a "Buffalo") moves for summary judgment, arguing that the undisputed material facts do not support Plaintiffs' claim that McAllister inhaled asbestos fibers from a Buffalo pump in any quantity, let alone a quantity sufficient to have constituted the requisite "substantial factor" in causing McAllister's mesothelioma. Buffalo maintains that the evidence shows, at most, that McAllister might

---

[194] *Slaughter*, 949 F.2d at 172-73.
[195] Rec. Doc. No. 307, p. 6 (citing *Slaughter*, 949 F.2d at 172).
[196] Rec. Doc. No. 239.
[197] Defendant Air & Liquid may be referred to interchangeably as "Buffalo" for purposes of this *Ruling*.

have encountered a Buffalo pump at some point during his service in the Navy, and such a showing is insufficient to meet Plaintiffs' burden of proving that McAllister inhaled asbestos fibers associated specifically with a Buffalo pump – rather than simply from equipment generally, or from some other source – and that such exposure was causally related to his mesothelioma.

Buffalo contends that only a single Buffalo pump was on the *TRITON*, and this pump was not externally insulated.[198]  Buffalo claims the only asbestos-containing materials associated with this Buffalo pump were an internal gasket and packing used to seal around and between metal surfaces to prevent the leakage of liquid being pumped under pressure.[199]  Buffalo also highlights McAllister's testimony that he could not recall the circumstances of work involving any specific Buffalo pump aboard either vessel,[200] nor could he recall how many times he worked on a Buffalo pump.[201]  Buffalo's naval expert testified that, when Navy nuclear submarines were underway, maintenance requiring that pumps be shut down to access internal components was rare.[202]  As to the *STURGEON*, Buffalo contends only four Buffalo pumps were aboard,[203] and none of these pumps were sealed with mechanical seals rather than packing stuffing boxes; therefore, none of them had any packing at all.[204]

Buffalo notes that even Plaintiffs' expert pathologist conceded that an encounter with a product on one or two occasions would equal a "trivial" exposure such that there

---

[198] Rec. Doc. No. 241-4, McAllister Depo., at 402:21-403:3; Rec. Doc. No. 241-5, Deposition of Kenneth Garza at 126:4-5.
[199] Rec. Doc. No. 241-3, Declaration of Martin K. Kraft, ¶ 9.
[200] Rec. Doc. No. 241-4, McAllister Depo., at 320:23-321:14; 322:13-18.
[201] *Id.* at 130:21-131:6.
[202] Rec. Doc. No. 241-6, Declaration of Captain Joseph C. McGowan, USNR, ¶ 9.
[203] Rec. Doc. No. 241-3, Declaration of Martin K. Kraft, ¶ 10.
[204] *Id.* at ¶ 11.

was no increased risk for the development of an asbestos-related disease like mesothelioma.[205]  According to Buffalo, the record reflects that McAllister would only have been around one Buffalo pump that could have potentially exposed him to asbestos during the course of his work on the *TRITON*, and thus Plaintiffs have failed to carry their burden of demonstrating genuine issues of material fact as to both McAllister's exposure and causation from his proximity to Buffalo pumps.

Plaintiffs counter Buffalo's motion with the following evidence.  McAllister testified the Buffalo pumps he worked around were used for applications involving temperature ranges of approximately 120°F to 200°F;[206] he worked with hundreds of pumps over the course of his service; and he worked with each brand of pump he identified roughly equally.[207]  McAllister testified:

> No, I specifically remember working on Buffalo pumps.  I just don't know how many.  I worked on a bunch of them, a whole lot of them, but I can't say, well, I worked on the auxiliary condensate pump in July of 1969, I can't say that, but I worked on a bunch of Buffalo pumps on the STURGEON and on the TRITON.[208]

McAllister also described what he recalled a Buffalo pump to look like.[209]  He also testified that, on the *TRITON*, he performed repair work on all the condensate pumps in engine room 1, and his responsibilities included maintenance on every pump and valve in that engine room.[210]  McAllister likewise worked on decommissioning the TRITON, which involved him draining all the systems, repairing pumps and valves, and preparing all the

---

[205] Rec. Doc. No. 241-8, Deposition of Brent Staggs, M.D., at 53:23-54:3.
[206] Rec. Doc. No. 285-3, McAllister Depo., at 118:09-14.
[207] *Id.* at 118:15-24.
[208] *Id.* at 308:21-309:4.
[209] *Id.* at 317:05-318:23.
[210] *Id.* at 100:05-101:08; Rec. Doc. No. 285-4, McAllister Depo. Vol. II, at 686:11-689:07.

equipment for decommissioning.[211]

Plaintiffs also point to documents identified by Buffalo evidencing the sale of its pumps for use aboard both the *STURGEON* and the *TRITON*.[212]    Plaintiffs contend Buffalo's corporate representative, Martin Kraft, confirmed that the records Buffalo has located proves the sale of two turbine generator condensate pumps as original equipment, along with onboard spare parts, for use aboard the *TRITON*.[213]    Further, the pumps Buffalo sold for use on the *TRITON* used asbestos-containing gaskets and packing and were delivered to the Navy with asbestos components installed.[214]    Indeed, Buffalo supplied technical manuals with those particular pumps that provided maintenance instructions which instructed the customer how to remove packing and how to replace gaskets.[215]

Plaintiffs' own naval expert, Captain Moore, provided evidence that a turbine generator condensate pump manufactured by Buffalo Pumps was sold for use aboard the *TRITON*,[216] and he opined that the Buffalo pumps of the type aboard the subject vessels would have utilized asbestos-containing packing and gaskets.[217]    Captain Moore also provided evidence that Buffalo regularly sold replacement parts for use with its pumps to the Navy, including asbestos-containing gaskets, and specifically to the Naval Supply

---

[211] *Id.* at 47:22-50:13.
[212] *See* Rec. Doc. No. 285-12 at no. 2; *see also* Rec. Doc. No. 285-13 at no. 2; *see also* Rec. Doc. No. 241-3, Declaration of Martin K. Kraft, ¶¶ 10-13.
[213] Rec. Doc. No. 285-14, Deposition of Martin Kraft, at 11:16-25; 12:15-22; 14:19-15:15.
[214] *Id.* at 15:19-25.
[215] *Id.* at 17:15-23; 18:17-19:01.
[216] Rec. Doc. No. 285-15, Deposition of Arnold P. Moore, P.E., at 267:12-25; 271:25-272:19; Rec. Doc. No. 285-16, Report of Arnold P. Moore, P.E.; *see also* Rec. Doc. No. 285-17, Declaration of Arnold P. Moore, P.E., at ¶ 16, and Exh. 1 thereto.
[217] Rec. Doc. No. 285-16, p. 12.

Center in Norfolk, Virginia, in 1965, among other locations.[218]

Based on the foregoing, Plaintiffs maintain that Buffalo is not entitled to summary judgment. Buffalo responds by attacking the credibility of McAllister's testimony, which it contends is directly contradicted by its documentary evidence and claiming that Plaintiffs mischaracterize the testimony and statements of its corporate representative. Credibility determinations are improper for the Court's consideration on summary judgment. Whether the documentary evidence supports Buffalo's position and is more credible and reliable than McAllister's deposition testimony are precisely questions for the jury to resolve. Likewise, whether evidence and testimony has been accurately characterized or substantiated is for the jury to resolve, not this Court under Rule 56.

Accordingly, the *Motion for Summary Judgment* filed by Air & Liquid Systems Corporation, as successor by merger to Buffalo Pumps, Inc. is DENIED.[219]

### G. Flowserve

Flowserve, as alleged successor to Rockwell Manufacturing Company and Edward Valves, Inc., moves for summary judgment, arguing that the evidence establishes that there were no Edward valves on the *STURGEON*;[220] only four total Edward valves were aboard the *TRITON*[221] and these valves were "beyond the ships force";[222] none of these valves were externally insulated;[223] and McAllister would not

---

[218] *Id.* at p. 12; *see also* Rec. Doc. No. 17 at ¶¶ 17-21, and Exhs. 2-6 thereto.
[219] Rec. Doc. No. 241.
[220] Rec. Doc. No. 242-4 at 281:11-22 and Report at p. 13.
[221] *See* Rec. Doc. No. 242-4, Deposition of Arnold Moore, at 278:13-281:10 and Expert Report of Arnold Moore at p. 13.
[222] *Id.* at 279:25-280:21. Captain Moore explained that "beyond the ships force" indicated that the work was likely done by a tender or a shipyard rather than the ships force, which were the sailors aboard the ships like McAllister. Rec. Doc. No. 284-14, Moore Depo., at 280:3-13.
[223] Rec. Doc. No. 242-3, McAllister Depo., at 583:18-584:1.

have operated or maintained valves as part of his Engineering Laboratory Technician ("ELT") position.[224]   Thus, Plaintiffs cannot carry their summary judgment burden of showing an issue of fact regarding McAllister's exposure to Edward valves being too remote to establish causation.

In opposition to Flowserve's motion, Plaintiffs rely heavily on the deposition testimony of McAllister and Captain Moore.  McAllister identified Edward valves as one of the "hundreds and hundreds" of valves he worked on while aboard both the *STURGEON* and the *TRITON*.[225]  McAllister also testified that there were "many, many" Edward valves in the engine room on the *TRITON*, but he qualified that he could not estimate an actual number because he "didn't go around counting the brand name."[226]

Captain Moore confirmed the presence of the four specific Edward valves in the *TRITON* engine room, and he testified that, while Flowserve's characterization that it was unlikely that McAllister would have worked on these valves as an ELT is "one interpretation," McAllister still could have performed packing work on these valves while they were in service.[227]   Captain Moore also evaluated documentary evidence suggesting it was possible that there were more than just four Edward valves aboard the *TRITON*.[228]

Like Buffalo, Flowserve attacks McAllister's testimony as being unsubstantiated and conflicting with documentary evidence.  However, as set forth above, the credibility

---

[224] Rec. Doc. No. 242-5, Deposition of Joseph McGowan, at 98:19-100:15 and Expert Report of Joseph McGowan at pp. 8-10.
[225] Rec. Doc. No. 284-3, McAllister Depo., at 96:12-97:02; 154:15-157:10; 158:25-159:09.
[226] Rec. Doc. No. 284-4, McAllister Depo., Vol. II, at 565:21-25; 567:10-18.
[227] Rec. Doc. No. 284-14, Moore Depo., at 280:5-281:8.
[228] Rec. Doc. No. 284-13, Declaration of Arnold P. Moore, P.E., at ¶ 16-19, and Exhs. 1-4 thereto.

and weight to be given to contradictory evidence is to be resolved by the jury, not this Court on summary judgment.  The Court finds that whether McAllister was exposed to asbestos as a result of working on or near Edward valves is a genuinely disputed fact question to be resolved by the jury.  Accordingly, Floweserve's *Motion for Summary Judgment*[229] is DENIED on this issue.

## H. Nonpecuniary Damages

All moving Defendants alternatively moved for partial summary judgment on Plaintiffs' request to be awarded nonpecuniary damages.  Notably, Plaintiffs have withdrawn any request for punitive damages; therefore, that issue is moot.[230]  However, the Parties disagree as to what constitutes pecuniary damages.

The Fifth Circuit has held:  "[T]here can be no question that injured seamen can seek recovery for their own pain and suffering under the Jones Act and the general maritime law."[231]  Additionally, under the Jones Act, a decedent's estate can bring a survival action to recover all losses suffered during the decedent's lifetime.[232]  While only pecuniary losses are available under the Jones Act, the term "pecuniary" has been extended beyond its typical meaning to encompass the decedent's pain and suffering.[233]

In *Bell v. Foster Wheeler Energy Corp.*, the district court for the Eastern District of Louisiana addressed whether damages for a decedent's pre-death pain and suffering are pecuniary or nonpecuniary.[234] The court noted that "such damages are considered to be

---

[229] Rec. Doc. No. 242.
[230] Rec. Doc. No. 265.
[231] *McBride v. Estis Well Service, L.L.C.*, 768 F.3d 382, 424 (Higginson, J., dissenting)(citing *Douse v. Global Pipelines Plus*, 253 Fed.Appx. 342 (5th Cir. 2007)).
[232] *See* 45 U.S.C. § 59 (incorporated by reference into the Jones Act per 46 U.S.C. § 30104).
[233] *See In re Denet Towing Serv., Inc.*, No. 98-1523, 1999 WL 329698, at *4 (E.D. La. May 21, 1999).
[234] 2017 WL 889074, *6 (E.D. La. Mar. 6, 2017).

pecuniary in the context of a Jones Act claim."[235] The court continued:

> The Court finds that claims for pre-death pain and suffering should be treated similarly under general maritime law. The relevant case law supports this view. *See Neal*, 707 F. Supp. at 867 (holding that damages for pre-death pain and suffering "are considered pecuniary damages, recoverable as survival damages to the decedent's estate under both the Jones Act and general maritime law") (citing *De Centeno v. Gulf Fleet Crews, Inc.*, 798 F.2d 138, 141 (5th Cir. 1986) (classifying damages for "predeath pain and suffering" as "pecuniary")). Further, though admittedly strange when compared with the usual understanding of the term "nonpecuniary," this view comports with the traditional maritime classification of pre-death pain and suffering as a pecuniary loss.[236]

The Court agrees with this analysis, and, to the extent Defendants move alternatively for summary judgment on pre-death pain and suffering-type claims, those motions are denied. Further, to the extent Defendants argue Plaintiffs cannot recover damages for loss of income because, according to McAllister's responses to an interrogatory asking if anyone was dependent on him, he answered in the negative, the Court disagrees.[237]

Plaintiffs respond by arguing that the loss of McAllister's Social Security retirement benefits is a "loss of income" for his estate and pointing to evidence in the record that his wife has lost the household services provided by McAllister like taking out the trash, assisting with general household chores and maintenance, handling the finances, and assisting in the care of an elderly aunt.[238]  Plaintiffs point to no evidence demonstrating that McAllister's surviving sons have suffered a loss of income or a loss of household services.

---

[235] *Id.* (citing *Denet Towing*, 1999 WL 329698 at *4; *see also Miles*, 498 U.S. at 22 (allowing the plaintiff's estate to recover for the pre-death pain and suffering of the decedent seaman)).
[236] *Id.*
[237] Rec. Doc. No. 237-2, p. 9 (citing Exhibit C, no. 7).
[238] Rec. Doc. No. 286-4, Deposition of Belinda McAllister, pp. 8, 10, 12-16, 28, & 38.

As noted by the district court for the Eastern District of Louisiana in *In re Fleet*: "Certainly, under both general maritime law and the Jones Act, survivors are entitled to recover 'pecuniary damages for loss of support and for loss of household services.'"[239] However, in *Fleet*, a surviving father was seeking such damages after the death of his seaman son.  The Court granted summary judgment to the defendants on this claim because the defendant presented evidence showing that the father did not receive any support or household services from his son prior to his death, and the father failed to submit acceptable summary judgment evidence demonstrating a factual dispute on this issue.[240]

Plaintiffs' *First Amended Complaint* alleges that McAllister's surviving sons are both adults who reside in the state of Florida, while McAllister's surviving spouse resides in Louisiana, where McAllister lived with her until his death.[241]  Thus, in accordance with the foregoing jurisprudence, damages for loss of income and/or loss of household services may only be recovered by McAllister's surviving spouse as executrix of his estate.

## III.    CONCLUSION

For the reasons set forth above, *Motions for Summary Judgment* filed by Defendants, Tate Andale, Inc.[242] and Velan Valve Corporation[243] are GRANTED, and these Defendants are dismissed from this matter with prejudice.   The *Motions for*

---

[239] 2017 WL 4574198 at *2 (E.D. La. Oct. 13, 2017)(quoting *Neal v. Barisich, Inc.*, 707 F. Supp. 862, 868 (E.D. La. 1989), aff'd, 889 F.2d 273 (5th Cir. 1989)).
[240] *Id.*
[241] Rec. Doc. No. 286, pp. 1-2.
[242] Rec. Doc. No. 233.
[243] Rec. Doc. No. 239.

*Summary Judgment* filed by Spirax-Sarco, Inc.,[244] Air & Liquid Systems Corporation,[245] and Flowserve US, Inc.[246] are DENIED.

*Judgment* shall not be entered until all claims in this case are resolved.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 14th day of August, 2020.

_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[244] Rec. Doc. No. 232.
[245] Rec. Doc. No. 241.
[246] Rec. Doc. No. 242.

Document Number: 60772                                    42